UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BEAR DEVELOPMENT, LLC,

                Plaintiff,

v.

CITY OF KENOSHA, and
REDEVELOPMENT AUTHORITY
OF THE CITY OF KENOSHA,

                Defendants.

Case No. 10-CV-1141-JPS

ORDER

On June 17, 2011, plaintiff Bear Development, LLC ("Bear") filed a Motion for Partial Summary Judgment (Docket #14).[1] The motion requests judgment only on Bear's first claim: breach of contract. At issue is a contract between Bear and defendants City of Kenosha ("City") and Redevelopment Authority of the City of Kenosha ("Redevelopment Authority," collectively, "Kenosha"). In short, that contract required Bear to enter into another agreement with Kenosha on terms Kenosha required, or else the original contract would be nullified. As discussed in greater detail below, Kenosha breached the contract by declaring it null and void despite Bear's acceptance of offered terms, or alternatively because Kenosha breached its duty of good faith and fair dealing.

---

[1]Kenosha has since filed its own motion for summary judgment on all claims. The court will simply dispose of Bear's motion first, as Kenosha's arguments have not changed in its more recent motion with regard to the breach of contract claim.

BACKGROUND

The following facts are undisputed. In March 2002, Kenosha and its environmental consultant, TRC Companies, Inc. ("TRC"), negotiated an "Exit Strategy Contract" with the then-owners of a parcel of land for the purpose of environmentally remediating and redeveloping it. (Pl.'s Proposed Findings of Fact [hereinafter PPFF] ¶ 4) (Docket #14-2). Through that contract, Kenosha acquired the parcel and set about remediating and redeveloping it in phases. (PPFF ¶¶ 5, 7). On January 8, 2008, the Redevelopment Authority issued a Request for Proposal ("RFP"), to which Bear submitted a response, for the third phase of development on the parcel. (PPFF ¶¶ 8-9). The Redevelopment Authority selected Bear as the developer, after which Bear and the Redevelopment Authority began negotiating the contract at issue in this case ("Land Contract"). (PPFF ¶¶ 13-14). After negotiation and revision, Bear, the Redevelopment Authority, and the City signed the finalized Land Contract, effective April 8, 2010. (PPFF ¶¶ 14-23). The Land Contract required Bear to pay $350,000, of which Bear paid the required $35,000 of earnest money. (PPFF ¶ 24).

More significant to this motion, the Land Contract also required that Bear enter into a separate contract ("Remediation Contract") with the City and TRC; the Land Contract's provision states,

> On or before September 1, 2010, [Bear] shall enter into such Agreements and upon such terms and conditions as may be required by [the City] and TRC Companies, Inc., acknowledging, accepting and agreeing to be bound by and pay for the [City's] obligations relating to the Parcel under the Exit Strategy Contract dated March 28, 2002 between Outokumpu Copper Kenosha, Inc., Atlantic Richfield Company, [the City,] and TRC Companies, Inc. In the event [Bear] fails to enter into such Agreements within the time

specified in this Section i, this Contract shall become null and void and all easement [sic] money shall be returned to [Bear].

(PPFF ¶ 25). Bear and Kenosha agreed that Kenosha would take the lead in drafting the Remediation Contract. (PPFF ¶ 58). On July 28, 2010, Mr. Khaligian, the City employee with responsibility for drafting the contract, contacted Bear and informed it that preparation of a draft was taking longer than expected. (PPFF ¶ 59). On August 13, 2010, Mr. Khaligian notified Bear that he would submit a proposed Remediation Contract by August 16, 2010. (PPFF ¶ 60). Mr. Khaligian then submitted a draft of the proposed contract on Friday, August 20, 2010. (PPFF ¶ 62). Bear had not been permitted to give input on the initial draft. (PPFF ¶ 63). According to Mr. Khaligian, he did not expect Bear would simply accept the terms, but rather would provide comments and suggestions. (PPFF ¶ 64). Bear officials believed that the proposed contract placed more onerous obligations on it than previous purchasers of parcels at the site and, due to Bear's concerns and wish to further negotiate, it informed Mr. Khaligian that on Monday, August 23, 2010, it would request a thirty-day extension, from September 1, 2010, to October 1, 2010, of the deadline for entry into a Remediation Contract. (PPFF ¶¶ 67-69). On Monday, August 30, 2010, in response to a written request, Bear was informed it needed to make the request of the City Administrator, Mr. Pacetti. (PPFF ¶ 74). On August 31, 2010, Mr. Pacetti agreed to only an eight-day extension, changing the deadline for entry into the Remediation Contract to September 9, 2010, at 4:30 p.m. (PPFF ¶ 76). On September 2, 2010, Mr. Khaligian confirmed to Bear that the City's offices would be closed for a furlough day on Friday, September 3, 2010, and that because September 6, 2010, was a holiday, the earliest Kenosha could begin reviewing

any of Bear's comments would be Tuesday, September 7, 2010, a day before the City's Finance Committee and Common Council meetings. (PPFF ¶ 81).

Bear submitted red-lined changes to the proposed contract at 9:48 a.m. on September 7, 2010. (PPFF ¶ 82). On September 8, 2010, Bear spoke with Mr. Pacetti to inform him that it would like to reach a consensus on any objections by City staff before staff opinions were passed on to the committees that would be meeting that evening. (PPFF ¶ 85). Bear also informed Mr. Pacetti that, if necessary, Bear would agree to the terms as originally proposed on August 20, 2010. (PPFF ¶ 86). Mr. Khaligian emailed the Finance Committee and Common Council a memorandum expressing opposition to sixteen of eighteen changes proposed by Bear and recommended denial of Bear's red-lined version. (PPFF ¶ 88). Later that day, a motion passed at the Finance Committee meeting to reject the contract, despite Bear's presence at the meeting and the fact that it informed the council it would be willing to accept the contract as proposed on August 20, 2010. (PPFF ¶¶ 91-93). Later that evening, at the Common Council meeting, a motion was made to reject the contract and Bear again informed the council that it would agree to the originally-proposed contract. (PPFF ¶¶ 94-95). The Common Council nonetheless voted to reject the contract, as drafted by Kenosha staff on August 20, 2010. (PPFF ¶ 97). Subsequently, on September 9, 2010, at 2:11 p.m., over two hours before the extended deadline, Bear delivered a signed copy of the August 20, 2010 proposed Remediation Contract. (PPFF ¶ 98). Kenosha later returned Bear's earnest money along with a cover letter declaring the Land Contract null and void, citing the clause requiring Bear to enter a Remediation Contract upon such terms and

conditions as required by the City and TRC. (PPFF ¶ 100). Bear has not negotiated the tendered check. (PPFF ¶ 100).

LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In other words, in determining whether a genuine issue of material fact exists, the court must construe all reasonable inferences in favor of the non-movant. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that

the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

This issue is ultimately resolved by simply referring to the language of the Land Contract requiring Bear to enter into a Remediation Contract "upon such terms and conditions as may be required by [the City] and TRC Companies, Inc." On the basis of the undisputed facts presented, Kenosha either made a proper offer which Bear accepted, or Kenosha never made an offer at all. If the former, then Kenosha's repudiation of the Land Contract was in direct violation of its terms, as Bear satisfied the provision requiring entry into the Remediation Contract. If the latter, then Kenosha breached its duty of good faith and fair dealing as a matter of law because it never made an offer of *any* terms or conditions for Bear to accept within the time period required under the Land Contract. Either conclusion is sufficient to grant summary judgment to Bear on its breach of contract claim, and the court will therefore grant the motion. However, the court will deny Bear's request for a remedy of specific performance.

I. BREACH OF CONTRACT

The first issue presented is whether the parties entered into a Remediation Contract, in which case Kenosha's declaration that the Land Contract was invalid would be a breach. As in other jurisdictions, contracts in Wisconsin are created through an offer and its acceptance. *Hooper v. O.M. Corwin Co.*, 225 N.W.2d 822, 824 (Wis. 1929). Here, however, the court need only decide whether Bear successfully accepted any offer made by Kenosha because, as discussed below, if Kenosha never made an offer, then it also breached the Land Contract.

Kenosha first argues that the parties never entered into a Remediation Contract because there was no meeting of the minds. Contracts in Wisconsin do require a meeting of the minds, *Household Utilities, Inc. v. Andrews Co.*, 236 N.W.2d 663, 669 (Wis. 1976), but that term is generally understood in reference to ensuring that the terms of the contract are sufficiently definite and certain. *Storck v. Eichmiller*, 2011 WI App 114, ¶ 7, 2011 WL 2555629, 801 N.W.2d 348. Kenosha primarily argues that, at some point, the City became wary that Bear was undercapitalized and was not up to performing the required remediation. It then states that it offered Bear a proposed Remediation Contract, Bear rejected and made a counteroffer, then Kenosha rejected the counteroffer and declared the Land Contract null and void. These arguments do not carry the day, however. The proposed terms, both Kenosha's August 20, 2010 proposed contract, as well as Bear's red-lined version, were sufficiently definite and certain based upon the undisputed facts. Thus, the only real question is whether Kenosha made an offer and whether Bear accepted it. In that vein, the facts show that Bear unequivocally accepted the August 20, 2010 proposed contract by repeatedly informing Kenosha that it would so accept if necessary, in addition to delivering a signed copy prior to the September 9, 2010 deadline.

The only wrinkle regards whether the August 20, 2010 proposed contract actually constituted an acceptable offer, and also whether Bear's initial "counter" by means of the red-lined version destroyed the August 20, 2010 offer. In either case, there would be no actual offer by Kenosha, thus breaching the duty of good faith and fair dealing. "Parties to a contract have a duty of good faith to each other." *Metro. Ventures, LLC v. GEA Assocs.*, 2006

WI 71, ¶ 35, 291 Wis. 2d 393, 717 N.W.2d 58. As the Wisconsin Supreme Court has stated,

> it may be said that contracts impose on the parties thereto a duty to do everything necessary to carry them out . . . . Moreover, there is an implied undertaking in every contract on the part of each party that he [or she] will not intentionally and purposely do anything to prevent the other party from carrying out his [or her] part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Ordinarily if one exacts a promise from another to perform an act, the law implies a counter-promise against arbitrary or unreasonable conduct on the part of the promisee.

*Id.* (alterations in original) (citing *Ekstrom v. State*, 172 N.W.2d 660 (Wis. 1969)).

If the August 20, 2010 proposed contract was not actually an offer, then at no point did Kenosha offer Bear *any* terms or conditions to agree to regarding remediation. While in many cases a question regarding whether a party breached the duty of good faith and fair dealing would require a jury to resolve factual questions, the utter failure to offer *any* terms for Bear to accept is the epitome of preventing Bear from fulfilling the obligation under the Land Contract to "enter into such Agreements and upon such terms and conditions as may be required by [the City] and TRC Companies, Inc."[2] As such, if the August 20, 2010 proposed Remediation Contract was not an offer, then Kenosha breached its duty under the Land Contract.

If, on the other hand, the August 20, 2010 proposed contract was an offer, but lapsed after Bear countered with the red-lined version, then

---

[2]*See Wis. Natural Gas Co. v. Gabe's Constr. Co.*, 582 N.W.2d 118, 122 & n.6 (Wis. Ct. App. 1998) (deciding question of breach of good faith and fair dealing where no material facts in dispute).

Kenosha again made *no* offer of terms or conditions. At first blush, it might seem to punish Kenosha on account of Bear's "rejection" of the August 20, 2010 offer, but that would ignore the fact that Bear ultimately chose to accept all of the proposed terms, unchanged. A party lacks good faith where it treats a counteroffer as nullifying the original, and then makes no further offer, nor permits the party to accept the original conditions which were presumably agreeable in the first instance.[3] Thus, even if the August 20, 2010 offer was nullified by Bear's red-lined version, Kenosha's failure to either negotiate further or to take Bear's later acceptance as valid would also be a breach of the duty of good faith and fair dealing.

In light of these conclusions, it is clear that, if Kenosha's August 20, 2010 proposed Remediation Contract was in fact an offer, Bear accepted it, making a breach Kenosha's declaration of the Land Contract as null and void. Alternatively, if it was not an offer, or if it was an offer that was nullified by Bear's submission of a red-lined version, then Kenosha violated its duty of good faith and fair dealing under the Land Contract by preventing Bear from entering into *any* Remediation Contract, thus also resulting in a breach.

Kenosha makes two brief arguments regarding entry into contract, but to no avail. It argues that the terms of the Remediation Contract were never finalized nor agreed to by formal execution, and that City staff members had no authority to bind the City in contract. First, though Kenosha cites authority for the proposition that if both parties understand that execution of a formal document is required, then it is a prerequisite to contract, *Lambert*

---

[3] Were the terms not agreeable, there would have been no offer for Bear to reject, returning the parties to the court's first conclusion regarding good faith.

Page 9 of 15

Case 2:10-cv-01141-JPS Filed 09/29/11 Page 9 of 15 Document 60

*Corp. v. Evans*, 575 F.2d 132, 135 (7th Cir. 1978), it offers no evidence that such was the understanding of the parties. Second, the cases Kenosha cites to support both a lack of authority on the part of City staff, and the requirement of formal execution, are inapposite or irrelevant,[4] and even were it correct that Mr. Khaligian lacked authority to make an offer binding on the City, then that fact would simply confirm that the City never made *any* offer of terms to Bear, thus breaching its duty of good faith and fair dealing.

Kenosha also makes a number of arguments as to why it did not breach its duty of good faith and fair dealing, but those too fail. Kenosha first argues that Bear's own representatives believed the City staff overseeing the

---

[4]Kenosha cites one case which stated that "a city attorney cannot make a valid contract on behalf of the city unless he has prior authority to do so," but that case dealt with a city attorney's authority to approve settlement of a lawsuit, not a city staff member charged with drafting the contract at issue. *Kocinski v. Home Ins. Co.*, 452 N.W.2d 360, 366 (Wis. 1990). Regarding formality of execution, Kenosha cites a case stating that where a statute specifies a municipality's manner of entering a contract, an informal contract must be ratified with the formality required by statute in order for the city to become liable. *Shulse v. City of Mayville*, 271 N.W. 643, 645 (Wis. 1937). Kenosha points to no statute here requiring a level of formality that was not satisfied. Kenosha also cites Wisconsin statute providing that no debts may be contracted against a city unless authorized by majority vote of the city council, Wis. Stat. § 62.12(6)(c), but that is similarly irrelevant given that this was a contract in which *Bear* would assume responsibility for the remediation obligations of the City and TRC. Another case cited by Kenosha held that a city engineer had no authority to modify the terms of a contract already entered by the city in a manner prescribed by statute. *Probst v. City of Menasha*, 13 N.W.2d 504, 506 (Wis. 1944). That rule is also entirely irrelevant given there is no attempt to modify an already-entered contract here (nor any manner of contract entry prescribed by statute). Finally, Kenosha points to public policy stating that binding municipalities to every representation made by a staff member would result in endless litigation, *Willow Creek Ranch, LLC v. Town of Shelby*, 2000 WI 56, ¶ 50, 235 Wis. 2d 409, 611 N.W.2d 693, but even if that general policy statement somehow operated to eviscerate the supposed offer at issue here, Mr. Khaligian was specifically put in charge of drafting the contract; he was not a random city employee that happened to make a representation to Bear.

remediation issues acted in good faith. But even if that is true, it is irrelevant what Bear representatives thought because the doctrine of prevention does not care whether the plaintiff had a subjective belief that some staffers operated in good faith. Further, the argument assumes that the court need only conclude that some City staff members operated in good faith, rather than analyzing the actions of the City as a whole. These arguments do nothing to rebut the court's conclusion that the City breached its duty if it never offered a Remediation Contract for Bear to accept.

Kenosha next argues that Bear failed to timely investigate and understand the remediation issues involved. This argument talks past the fact that Bear unambiguously attempted to accept the August 20, 2010 proposed contract. Whether Bear fully understood the issues involved in the actual remediation under the proposed Remediation Contract is irrelevant to the question of whether Kenosha breached its duty by failing to offer Bear any terms which it could accept.

Kenosha also attempts to rebut Bear's theory that Kenosha breached its duty by dragging its feet throughout the Remediation Contract negotiation. However, the court has not relied on this theory, and thus Kenosha's response is similarly irrelevant to the question of whether Kenosha breached its duty by failing to offer Bear any terms at all.

Finally, Kenosha offers what amount to three separate defenses meant to validate its declaration of the Land Contract as null and void: (1) Bear itself breach its duty of good faith; (2) Bear breached the Land Contract through

repudiation; and (3) Bear misrepresented its expertise.[5] Kenosha's entire argument on the first defense is that Bear breached its duty by failing to perform timely due diligence with regard to entering the Remediation Contract. However, the Land Contract required only that Bear enter into an agreement under the terms required by the City and TRC. Bear unambiguously attempted to do so, late in the game as it may have been, and thus Bear could not have breached its duty by preventing performance of the contract.

Regarding Kenosha's second defense, where a party repudiates a contract, the non-repudiating party is excused from performance. *Wis. Dairy Fresh, Inc. v. Steel & Tube Prods. Co.*, 122 N.W.2d 361, 367 (Wis. 1963). Repudiation occurs where a party announces by statement or act that the party will not or cannot perform the contract. Restatement (Second) of Contracts § 250. However, to qualify as repudiation, a statement cannot simply be an expression of doubt as to willingness or ability to perform, and an act must make the party's performance actually or apparently impossible. Restatement (Second) of Contracts § 250 cmt. b, c. Kenosha goes on to discuss the law surrounding repudiation in more depth, but ultimately argues that Bear repudiated the Land Contract by "signal[ing] its unwillingness to handle the remediation." But Kenosha confuses the requirements of any potential Remediation Contract with the requirements of the Land Contract. The Land Contract required only that Bear enter into a Remediation Contract on terms considered suitable by the City and TRC.

---

[5]Bear points out that these three arguments amount to affirmative defenses that Kenosha never plead in its Answer. However, they are easily disposed of, and the court will do so for the sake of thoroughness.

Bear unambiguously offered to do so, and thus did not repudiate the Land Contract.

Finally, a contract is voidable where a party's assent is induced by fraudulent or material misrepresentation. *First Nat'l Bank & Trust Co. of Racine v. Notte*, 293 N.W.2d 530, 538 (Wis. 1980). However, Kenosha's argument again relies on painting Bear as having misrepresented its ability to complete any remediation required of it in a potential Remediation Contract. Once more, that argument is irrelevant because the contract at issue in this action is the Land Contract, which only required that Bear enter into a Remediation Contract upon whatever terms Kenosha found appropriate. There are no facts to suggest that Bear ever misrepresented that it was willing to enter into a Remediation Contract, and in fact confirmed its willingness to do so by repeatedly attempting to accept the August 20, 2010 proposed contract. Bear did not commit a misrepresentation making the Land Contract voidable. In sum, the court's analysis remains undisturbed by Kenosha's arguments and it will, therefore, grant Bear's motion.

II.  REMEDY

As to the proper remedy, Bear requests the court order the Land Contract be specifically performed. In an action related to an interest in real property, Wisconsin law permits a party to seek specific performance of a contract. Wis. Stat. § 840.03(1)(f). The grant of such a remedy is discretionary with the court. *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 2010 WI 44, ¶ 32, 324 Wis. 2d 703, 783 N.W.2d 294. Specific performance in a contract for land is ordinarily granted unless the circumstances would make it unfair, unreasonable, or impossible. *Anderson v. Onsager*, 455 N.W.2d 885, 889 (Wis. 1990). Other authority recognizes that courts might decline to grant a specific

performance remedy if the contract requires a party to obtain approval of a third party, such as obtaining permits from a government agency, for example. 71 Am. Jur. 2d Specific Performance § 114. Thus, while a simple contract to convey land for a purchase price might normally be well-suited for specific performance, more complicated real estate contracts may not. For example, a Connecticut court struck a plaintiff's request for specific performance where the contract to convey real estate contained numerous milestones and conditions precedent, some of which depended on the actions of third parties. *Ceruzzi Derby Redevelopment, LLC v. City of Derby*, No. X05CV085009782S, 2009 WL 2357963, at *2-3 (Conn. Super. Ct. July 1, 2009). As the Connecticut court put it,

> a shotgun marriage based upon the Contract . . . would not satisfy the principles of equity. This is particularly so in light of the many project milestones Plaintiff has alleged here, milestones which, if they are to be achieved at all, would require the diligent efforts of dozens of people acting on behalf of the parties to the Contract, as well as third parties not bound by that Contract. A failure to achieve any one of these milestones in the future might quickly be ascribed to a lack of good faith or a failure of effort, similar to what is already alleged here.

*Id.* at *3.

Here, the Land Contract requires Bear to not only enter into a Remediation Contract on terms acceptable to Kenosha, but also on terms acceptable to TRC Companies, Inc., which is *not* a party to the Land Contract. (Mills Decl. Ex. 13, at ¶ 5.f.i) (Docket #15). Moreover, the Land Contract appears to contain other conditions precedent that remain to be fulfilled, for example, the Land Contract also requires Bear to provide Kenosha with a Material Management Plan as approved by the Wisconsin Department of

Natural Resources, another entity not party to the Land Contract. (Mills Decl. Ex. 13, at ¶ 5.f.v). Under these circumstances, the court concludes it would be unwise, indeed impracticable, to order specific performance where, like *Ceruzzi*, so much remains to be done that may yet result in the parties alleging further breaches of good faith. Thus, the court will decline to exercise its discretion to order specific performance at this juncture. At the same time, the court also appreciates that Bear spent little time briefing this issue and Kenosha did not address it at all. Therefore, the court will consider an expedited motion to reconsider this aspect of the ruling in advance of the scheduled trial date addressed in a separate order which follows.

Accordingly,

IT IS ORDERED that the plaintiff's Motion for Partial Summary Judgment (Docket #14) be and the same is hereby GRANTED.

Dated at Milwaukee, Wisconsin, this 29th day of September, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge